**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| **CATHOLIC DIOCESE OF BEAUMONT;** ) | |
| **CATHOLIC CHARITIES OF** ) | |
| **SOUTHEAST TEXAS, INC.,** ) | |
| ) | |
| *Plaintiffs*, ) | |
| **v.** ) | |
| ) | |
| **KATHLEEN SEBELIUS, in her official** ) | |
| **capacity as Secretary of the U.S.** ) | |
| **Department of Health and Human** ) | **Civil Action No. _____** |
| **Services; THOMAS PEREZ, in his official** ) | |
| **capacity as Secretary of the U.S.** ) | **DEMAND FOR JURY TRIAL** |
| **Department of Labor, JACOB J. LEW, in** ) | |
| **his official capacity as Secretary of the** ) | |
| **U.S. Department of Treasury; U.S.** ) | |
| **DEPARTMENT OF HEALTH AND** ) | |
| **HUMAN SERVICES; U.S.** ) | |
| **DEPARTMENT OF LABOR; and U.S.** ) | |
| **DEPARTMENT OF TREASURY,** ) | |
| ) | |
| *Defendants*. ) | |
| ) | |

## ORIGINAL COMPLAINT

1.     This lawsuit is about one of America's most cherished freedoms: the freedom to practice one's religion without government interference.  It is not about whether people have a right to abortion-inducing products, sterilization, and contraception.  Those products and services are widely available in the United States, and nothing prevents the Government itself from making them more widely available.   Here, however, the Government seeks to require Plaintiffs—all of which are Catholic entities—to violate their sincerely held religious beliefs by providing, paying for, and/or facilitating access to those products and services.  American history and tradition, embodied in the First Amendment to the United States Constitution and the Religious Freedom Restoration Act ("RFRA"), safeguard religious entities from such overbearing

and oppressive governmental action.  Plaintiffs therefore seek relief in this Court to protect this most fundamental of American rights.

2.     Plaintiffs provide a wide range of spiritual, educational, and social services to members of their communities, Catholic and non-Catholic alike.  Plaintiff Catholic Diocese of Beaumont (the "Diocese"), not only provides pastoral care and spiritual guidance for thousands of Catholics, but also provides education and essential social ministry to thousands of Catholics and non-Catholics throughout the nine East Texas counties.  As an extension of the Diocese's mission of Catholic ministry, Plaintiff Catholic Charities of Southeast Texas, Inc. ("Catholic Charities") offers a host of social services to thousands in need throughout those same nine East Texas counties.

3.     Plaintiffs' work is in every respect guided by and consistent with Roman Catholic belief, including the requirement that they serve those in need, regardless of their religion.  This is perhaps best captured by words attributed to St. Francis of Assisi: "Preach the Gospel at all times. Use words if necessary."  As Pope Benedict XVI has more recently put it, "[L]ove for widows and orphans, prisoners, and the sick and needy of every kind, is as essential to [the Catholic Church] as the ministry of the sacraments and preaching of the Gospel.  The Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  As Plaintiff Catholic Charities notes, "We like to say that we serve people because of our faith, not theirs. Our faith calls us to serve others, regardless of their personal faith traditions."  Thus, Catholic individuals and organizations consistently work to create a more just community by serving any and all neighbors in need.

4.     Catholic Church teachings also uphold the firm conviction that sexual union should be reserved to married couples who are open to the creation of life; thus, artificial interference

with the creation of life, including through abortion, sterilization, and contraceptives, is contrary to Catholic doctrine.

5.   Defendants have promulgated various rules (collectively, "the U.S. Government Mandate") that force Plaintiffs to violate their sincerely held religious beliefs.  These rules, first proposed on July 19, 2010, require Plaintiffs and other Catholic and religious organizations to provide, pay for, and/or facilitate access to abortion-inducing products, sterilization, and contraception, in violation of their sincerely held religious beliefs.  In response to the intense public criticism that the Government's original proposal provoked, including by some of the current Administration's most ardent supporters, the Government proposed changes to the rules that, it asserted, were intended to eliminate the substantial burden that the Mandate imposed on religious beliefs.  In fact, however, these changes made that burden worse by significantly *increasing* the number of religious organizations subject to the U.S. Government Mandate, and by driving a wedge between religious organizations, such as Plaintiff Diocese, and equally religious charitable and educational arms of the Church, such as Plaintiff Catholic Charities.

6.   In its final form, the U.S. Government Mandate contains three basic components:

7.   First, it requires employer group health plans to cover, without cost-sharing requirements, all "FDA-approved contraceptive methods and contraceptive counseling"—a term that includes abortion-inducing products, contraception, sterilization, and related counseling and education.

8.   Second, the Mandate creates a narrow exemption for certain "religious employers," defined to include only organizations that are "organized and operate[] as a nonprofit entity and [are] referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended."  The referenced Code section does not, nor is it intended to, address religious liberty.

Instead, it is a paperwork-reduction provision that addresses whether and when tax-exempt nonprofit entities must file an annual informational tax return, known as a Form 990.  As the Government has repeatedly affirmed, this exemption is intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions." 78 Fed. Reg. 8,456, 8,461 (Feb. 6, 2013); see also 78 Fed. Reg. 39,870, 39,874 (July 2, 2013). Consequently, the only organizations that qualify for the exemption are "churches, synagogues, mosques, and other houses of worship, and religious orders."  78 Fed. Reg. at 8,461.  This is the narrowest "conscience exemption" ever adopted in federal law.  It grants the Government broad discretion to sit in judgment of which groups qualify as "religious employers," thus favoring certain religious organizations over others and entangling the Government in matters of religious faith and practice.

9.    Third, the U.S. Government Mandate creates a second class of religious entities that, in the Government's view, are not sufficiently "religious" to qualify for the "religious employer" exemption.  These religious entities, deemed "eligible organizations," are subject to a so-called "accommodation" that is intended to eliminate the burden that the Mandate imposes on their religious beliefs.  The "accommodation," however, is illusory:  it continues to require "eligible organizations" to participate in a new employer-based scheme to provide, pay for, and/or facilitate access by employees to products and services that are completely contrary to the fundamental beliefs of the organizations.

10. Catholic Charities does not qualify under the Government's narrow definition of "religious employers," even though it is quintessentially a religious organization under any reasonable definition of the term.  Its very existence is dependent upon upholding all of the tenets of the Catholic faith in the social ministries it provides on behalf of the Diocese, and as

required by the Diocese.  While Catholic Charities is an "eligible organizations" subject to the so-called "accommodation," the "accommodation" does nothing to change the Government's requirement that Plaintiff enter into a contract with an insurance company which, as a direct result, is required to provide or procure abortion-inducing products, contraception, sterilization, and related counseling for this Plaintiff's employees.  Consequently, as religious organizations, Plaintiffs' actions are the trigger and but-for cause of the provision of the objectionable products and services.  Plaintiffs cannot avoid facilitating the provision of the objectionable products and services—for example, by contracting with an insurance company that will not provide or procure the objectionable products and services or even dropping their health-insurance plans altogether—without subjecting themselves to crippling fines and/or lawsuits by individuals and governmental entities.

11. Plaintiffs, moreover, must facilitate the provision of the objectionable services in other ways that further exacerbate their religiously impermissible cooperation in the provision of the objectionable products and services.  For example, in order to be eligible for the so-called "accommodation," Plaintiff Catholic Charities must provide (with the approval of Plaintiff Diocese) a "certification" to the insurance provider setting forth its religious objections to the Mandate.  The provision of this "certification," in turn, automatically triggers an obligation on the part of the insurance provider to provide or procure the objectionable products and services for the employees of the Plaintiff Catholic Charities.  A religious organization's self-certification, therefore, is a trigger and but-for cause of the provision of the objectionable products and services.

12. Indeed, notwithstanding the "accommodation," the U.S. Government Mandate "requires the objecting religious organization to fund or otherwise facilitate the morally

objectionable coverage."   Comments of U.S. Conference of Catholic Bishopa, at 3 (Mar. 20, 2013), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf.   The Government asserts that the provision of the objectionable products and services will be "cost-neutral."   This assertion, however, ignores the regulatory and administrative costs that will inevitably force insurance companies and third-party administrators to increase the prices they charge religious employers subject to the "accommodation."   The Government's assertion of "cost neutrality" is also based on the implausible (and morally objectionable) assumption that "lower costs [from] fewer childbirths" will offset the cost of the contraceptive services.  78 Fed. Reg. at 8463.  More importantly, even if the Government's assumption were correct, it simply means that premiums previously going toward childbirths will be redirected to contraceptive and related services in order to achieve the (objectionable) goal of "fewer childbirths."

13.  In short, the "accommodation" requires non-exempt religious organizations, including Plaintiffs, to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related counseling, contrary to their sincerely-held religious beliefs.

14.  The Diocese appears to qualify as a "religious employer," and, as such, is eligible for the "religious employer" exemption from the Mandate.  However, the Diocese operates an insurance plan that encompasses not only individuals directly employed by the Diocese itself, but, in addition, individuals employed by Catholic Charities.  Because Catholic Charities does not itself appear to qualify as an exempt "religious employer," the Government's newly minted interpretation of the Mandate requires that the Diocese must either (1) sponsor a plan that will provide, pay for, and/or facilitate the provision of the objectionable products and services to the

employees of Catholic Charities, or (2) no longer extend its plan to Catholic Charities, subjecting it to massive fines if it does not   contract with another insurance provider that will offer the objectionable coverage.

15.   This reflects a change from the Government's original interpretation of the Mandate.  That interpretation allowed Catholic Charities to remain on the Diocese's plan, which, in turn, would have shielded it from the Mandate if the Diocese were exempt.  *See* 77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).    The Final Rule, in contrast, removes this protection and thereby *increases* the number of religious organizations subject to the Mandate.  And in so doing, the Mandate seeks to divide the Catholic Church, artificially separating its "houses of worship" from its faith in action, directly contrary to Pope Benedict's admonition that "[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."

16.   The U.S. Government Mandate is irreconcilable with the First Amendment, RFRA, the Administrative Procedure Act, and other laws.  The Government has not demonstrated any compelling interest in forcing Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, sterilization, and contraception.  Nor has the Government demonstrated that the U.S. Government Mandate is the least restrictive means of advancing any interest it has in increasing access to these products and services, which are already widely available and which the Government could make more widely available without conscripting Plaintiffs as vehicles for the dissemination of products and services to which they so strongly object.  The Government, therefore, cannot justify its decision to force Plaintiffs to provide, pay for, and/or facilitate access to these products and services in violation of their sincerely held religious beliefs.

17.     Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## I.     PRELIMINARY MATTERS

18.     Plaintiff Catholic Diocese of Beaumont is a nonprofit unincorporated religious organization organized and existing according to the Code of Canon Law of the Roman Catholic Church and recognized by the State of Texas.  The Diocese includes Roman Catholic parishes, schools, and organizations in East Texas.  The principal office of the Diocese is located in Beaumont, Texas.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

19.     Plaintiff Catholic Charities is a nonprofit corporation incorporated in the State of Texas.  Its principal place of business is in Beaumont, Texas.  It is organized exclusively for charitable, religious, and educational purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code.

20.     Defendant Kathleen Sebelius is the Secretary of the U.S. Department of Health and Human Services ("HHS").  She is sued in her official capacity.

21.     Defendant Thomas Perez is the Secretary of the U.S. Department of Labor.  He is sued in his official capacity.

22.     Defendant Jacob J. Lew is the Secretary of the U.S. Department of the Treasury.  He is sued in his official capacity.

23.     Defendant U.S. Department of Health and Human Services is an executive agency of the United States within the meaning of RFRA and the Administrative Procedure Act ("APA").

24.     Defendant U.S. Department of Labor is an executive agency of the United States within the meaning of RFRA and the APA.

25.     Defendant U.S. Department of the Treasury is an executive agency of the United States within the meaning of RFRA and the APA.

26.     This is an action for declaratory and injunctive relief under 5 U.S.C. § 702, 28 U.S.C. §§ 2201, 2202, and 42 U.S.C. § 2000bb-1.

27.     An actual, justiciable controversy currently exists between Plaintiffs and Defendants.   Absent a declaration resolving this controversy and the validity of the U.S. Government Mandate, Plaintiffs will be required to provide, pay for, and/or facilitate access to objectionable products and services in contravention of their sincerely held religious beliefs, as described below.

28.     Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

29.     This Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331, 1343(a)(4), and 1346(a)(2).

30.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1).

**A.      The Diocese**

31.     The Diocese encompasses forty-four parishes and seven missions and serves a region that comprises nine counties (spanning 8,392 square miles) in East Texas, with a population of approximately 628,794, including 73,672 Roman Catholics.  The counties within the Diocese are Chambers, Hardin, Jasper, Jefferson, Liberty, Newton, Orange, Polk and Tyler.  This region was originally served by The Catholic Diocese of Galveston, beginning in 1847, which was re-designated the Diocese of Galveston-Houston on July 25, 1959.  On September 29, 1966, Pope Paul VI established the Diocese of Beaumont to serve these nine counties (as well as four others which were later made part of the Diocese of Tyler, formed in 1986).  The parishes and missions of the Diocese and its five schools are part of the Diocese.

32.     The Most Rev. Curtis J. Guillory, S.V.D., D.D. ("Bishop Guillory") is over the Diocese.

33.     Bishop Guillory is assisted in his ministry by a staff of numerous clergypersons, religious brothers and sisters, and lay people.  The Diocese employs over 950 people, over 370 of who are currently eligible for health plan benefits offered through the Diocese.  The Diocese employs Catholic and non-Catholic persons, and it does not generally track how many of its employees are Catholic, members of other religious faiths, or non-religious.

34.     The Diocese carries out a tripartite spiritual, educational, and social service mission, reflecting the several dimensions of its ministry.  The spiritual ministry of the Diocese is conducted largely through its parishes.  Through the ministry of its priests, the Diocese ensures the regular availability of the sacraments to all Catholics, living or visiting, within its nine counties.  It also provides numerous other opportunities for prayer, worship, and faith formation.  In addition to overseeing the sacramental life of its parishes, the Diocese coordinates Catholic campus ministry for the students at Lamar University, as well as other ministries throughout the region.

35.     The Diocese conducts much of its educational mission through its schools.  The first Catholic school in Southeast Texas opened in 1895 in Beaumont (St. Anthony School).  With a focus on faith formation, rigorous academics, and service to others, the Diocese's schools are committed to assisting parents in preparing their children to meet the challenges of the modern world.   Students of diocesan schools are provided opportunities to develop basic academic and physical skills, to pursue knowledge, and to critically study and analyze the world in which they live.  The schools of the Diocese follow curriculum standards based upon national Catholic education standards, core curriculum standards, and the social teachings of the Catholic

Church.  Each of the five Catholic schools within the Diocese is fully accredited through the Texas Catholic Conference Accreditation Commission.

36.     There are five diocesan schools, which educate approximately 1532 high school and elementary students.  The Diocese and its parishes operate all five of these schools, which employ approximately 232 teachers and other school staff.

37.     The schools of the Diocese offer a unique educational experience unlike any other in the area.  Diocesan schools have established three priorities that make them stand out from other educational institutions.  Students are taught faith—not just the basics of Christianity, but how to have a relationship with God that will remain with them after they leave their Catholic school.  Service, the giving of one's time and effort to help others, is taught as both a requirement of faith and good citizenship.  Finally, high academic standards help each student reach his or her potential.  Nationally, over 99% of students in Catholic high schools graduate.

38.     The Catholic educational system has demonstrated a particular dedication to teaching the underserved.  Indeed, diocesan schools welcome students in all financial conditions, from all backgrounds, and of any or no faith.  Twenty-nine percent of students in diocesan schools are from minority backgrounds, and twenty-two percent of diocesan students are not Catholic.  To make a Catholic education available to as many children as possible, the Diocese and its parishes and schools expend substantial funds in tuition assistance programs.  In addition, the Diocese provides Catholic religious education in all of its 44 parishes to approximately 1,287 public high school students and 5,017 elementary and middle public school children.

39.     Much of the social service and charitable work of the Diocese is performed through its 51 parishes and missions, which, like the six schools discussed above, are organized as part of the Diocese.  The parishes within the Diocese maintain their own charitable efforts,

serving the needs of their communities with programs including food pantries for the poor, adopt-a-family programs at Christmas, meals served to the homeless, outreach and support for women in crisis pregnancies, health-care assistance programs, pastoral care to the sick, prisoner and immigrant ministry, and visits to nursing homes and hospitals.

40.     In summary, the Diocese of Beaumont, a nonprofit religious organization organized and existing according to the Code of Canon Law of the Roman Catholic Church and recognized by the State of Texas, employs approximately 950 persons, over 370 of whom are eligible for health plan benefits offered through the Diocese.  The Diocese includes five diocesan schools that serve approximately 1,532 students.  And through its parishes, the Diocese serves an indeterminate number of persons who are homeless, hungry, elderly, or otherwise in need of material, educational, pastoral, or other assistance, without regard to religious belief.

41.     The Diocese qualifies as a "religious employer" under the narrow exemption from compliance with the U.S. Government Mandate.

42.     The Diocese provides health insurance coverage to employees through the Christian Brothers Employee Benefit Trust, a self-funded church plan which serves employers of the Catholic Church by providing medical benefits to health plan participants.  Health plan materials specifically state that "the Trust works within the framework of the tenets of the Catholic Church."  To that end, the Trust health plan does not cover abortion or sterilization drugs or services, nor does it cover contraceptives, except when prescribed to treat a medical illness and approved by the Trust.

43.     Moreover, the Christian Brothers Employee Benefit Trust health plan offered by the Diocese does not meet the definition of a "grandfathered" plan under the Patient Protection and Affordable Care Act.  Since March 2010, changes to the health plan have resulted in

increases to plan deductible amounts that exceed "medical inflation" as defined in 26 C.F.R. § 549815-1251T.  Additionally, health plan materials provided to participants or beneficiaries have not included a statement that the plan is believed to be a grandfathered plan, as required by 26 C.F.R. § 54.9815-1251T(a)(2)(ii).

44.     Plaintiff Catholic Charities offers coverage through the Diocese's insurance plan.

45.     The plan year for the Diocese (and the organizations participating in its plan) begins on March 1.

**B.     Catholic Charities**

46.     Catholic Charities, one of the largest nongovernmental social service providers in the region, annually provides services to over 4,962 people.  "Catholic Charities is charged by the Diocese of Beaumont to defend and insure the preservation of human dignity. Inspired by the social teachings of the Church, we strive to improve the lives of those individuals and families who utilize our services, by recognizing and addressing the evolving needs of our society. It is our vision to achieve a universal community that is stronger physically, mentally, emotionally and spiritually, willing and empowered to care for the needs of all its members."

47.     To that end, it carries out the mandates of the Gospel and the social teaching of the Church through works of Christian charity, service, and social justice by providing competent and caring social services, special assistance to those in great need, and programs of community outreach and advocacy using the skills and talents of professional staff and volunteers.  Catholic Charities pursues these goals through its own programs and through partnerships with parishes, community groups, and governmental agencies.

48.     Multiple programs run by Catholic Charities provide a panoply of services to the community.  They are available to people in need without regard to their religion.

49.     The following are just three examples of Catholic Charities work:  1) Immigration Services is the only non-profit in Southeast Texas recognized by the BIA and U.S. Citizenship and Immigration Service (USCIS), formerly known as Immigration and Naturalization Service (INS), to provide legal immigration services to clients.  The Immigration Services Director is accredited to represent clients in immigration matters before the USCIS.   2) The Hospitality Center is a clean, safe and dignified environment where a hearty, daily meal is provided for the elderly on fixed incomes, temporarily needy, working poor, disabled and homeless persons.  Last year, the Hospitality Center served approximately 40,000 meals.  3) Elijah's Place is a program to provide ongoing grief support services to children, ages 5 to 18, who have experienced the death of a parent or sibling.   Elijah's Place grief support provides a setting for age specific group support sessions for the children (ages 5-6, 7-10, 11-13, and 14-18) and a support session for parents.  Parents and children come to Elijah's Place two evenings each month.  Participation in the program can last 12 to 18 months, or until the family decides they no longer require the service.

50.     Catholic Charities has approximately 18 full-time employees.  Like the Diocese, Catholic Charities employs individuals of all faiths.

51.     Catholic Charities is a member-director corporation.

52.     Catholic Charities does not qualify as an entity described in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  Accordingly, Catholic Charities does not qualify as a "religious employer" under the exemption to the U.S. Government Mandate.

53.     Catholic Charities employees are offered health insurance through the Diocese's health plan.

## II.   **STATUTORY AND REGULATORY BACKGROUND**

### A.   **Statutory Background**

54.     In March 2010, Congress enacted the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010), and the Health Care and Education Reconciliation Act, Pub. L. No. 111-152, 124 Stat. 1029 (2010) (collectively, the "Affordable Care Act" or the "Act").  The Affordable Care Act established many new requirements for "group health plan[s]," broadly defined as "employee welfare benefit plan[s]" within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1002(1), that "provide[] medical care . . . to employees or their dependents."  42 U.S.C. § 300gg-91(a)(1).

55.     As relevant here, the Act requires an employer's group health plan to cover certain women's "preventive care."  Specifically, it indicates that "[a] group health plan and a health insurance issuer offering group or individual health insurance coverage shall, at a minimum[,] provide coverage for and shall not impose any cost sharing requirements for . . . with respect to women, such additional preventive care and screenings . . . as provided for in comprehensive guidelines supported by the Health Resources and Services Administration for purposes of this paragraph."  42 U.S.C. § 300gg-13(a)(4).  Because the Act prohibits "cost sharing requirements," the health plan must pay for the full costs of these "preventive care" services without any deductible or co-payment.

56.     "[T]he Affordable Care Act preserves the ability of individuals to retain coverage under a group health plan or health insurance coverage in which the individual was enrolled on March 23, 2010."  Interim Final Rules for Group Health Plans and Health Insurance Issuers Relating to Coverage of Preventive Services Under the Patient Protection and Affordable Care Act, 75 Fed. Reg. 41,726, 41,731 (July 19, 2010) ("Interim Final Rules"); 42 U.S.C. § 18011.  These so-called "grandfathered health plans do not have to meet the requirements" of the U.S.

Government Mandate.  75 Fed. Reg. at 41,731.  HHS estimates that "98 million individuals will be enrolled in grandfathered group health plans in 2013."  *Id.* at 41,732.

57.     Federal law provides several mechanisms to enforce the requirements of the Act, including the U.S. Government Mandate.  For example:

a.      Under the Internal Revenue Code, certain employers who fail to offer "full-time employees (and their dependents) the opportunity to enroll in minimum essential coverage under an eligible employer-sponsored plan" will be exposed to significant annual fines of $2,000 per full-time employee.  *See* 26 U.S.C. § 4980H(a), (c)(1).

b.      Under the Internal Revenue Code, group health plans that fail to provide certain required coverage may be subject to a penalty of $100 a day per affected beneficiary.  *See* 26 U.S.C. § 4980D(b); *see also* Jennifer Staman & Jon Shimabukuro, Cong. Research Serv., RL 7-5700, Enforcement of the Preventative Health Care Services Requirements of the Patient Protection and Affordable Care Act (2012) (asserting that this applies to employers who violate the "preventive care" provision of the Affordable Care Act).

c.      Under ERISA, plan participants can bring civil actions against insurers for unpaid benefits.  29 U.S.C. § 1132(a)(1)(B); *see also* Cong. Research Serv., RL 7-5700.

d.      Similarly, the Secretary of Labor may bring an enforcement action against group health plans of employers that violate the U.S. Government Mandate, as incorporated by ERISA.  *See* 29 U.S.C. § 1132(b)(3); *see also* Cong. Research Serv., RL 7-5700 (asserting that these penalties can apply to employers and insurers who violate the "preventive care" provision of the Affordable Care Act).

58.     Several of the Act's provisions, along with other federal statutes, reflect a clear congressional intent that the executive agency charged with identifying the "preventive care" required by § 300gg-13(a)(4) should exclude all abortion-related services.

59.     For example, the Weldon Amendment, which has been included in every HHS and Department of Labor appropriations bill since 2004, prohibits certain agencies from discriminating against an institution based on that institution's refusal to provide abortion-related services.  Specifically, it states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions."  Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).  The term "health care entity" is defined to include "an individual physician or other health care professional, a hospital, a provider-sponsored organization, a health maintenance organization, *a health insurance plan*, or any other kind of health care facility, organization, or plan." *Id.* § 507(d)(2) (emphasis added).

60.     The legislative history of the Act also demonstrates a clear congressional intent to prohibit the executive branch from requiring group health plans to provide abortion-related services.  For example, the House of Representatives originally passed a bill that included an amendment by Congressman Bart Stupak prohibiting the use of federal funds for abortion services.  *See* H.R. 3962, 111th Cong. § 265 (Nov. 7, 2009).  The Senate version, however, lacked that restriction.  S. Amend. No. 2786 to H.R. 3590, 111th Cong. (Dec. 23, 2009).  To avoid a filibuster in the Senate, congressional proponents of the Act engaged in a procedure known as

"budget reconciliation" that required the House to adopt the Senate version of the bill largely in its entirety.  Congressman Stupak and other pro-life House members, however, indicated that they would refuse to vote for the Senate version because it failed to adequately prohibit federal funding of abortion.  In an attempt to address these concerns, President Barack Obama issued an executive order providing that no executive agency would authorize the federal funding of abortion services.  *See* Exec. Order No. 13535, 75 Fed. Reg. 15,599 (Mar. 24, 2010).

61.     The Act, therefore, was passed on the central premise that all agencies would uphold and follow "longstanding Federal laws to protect conscience" and to prohibit federal funding of abortion.  *Id.*  That executive order was consistent with a 2009 speech that President Obama gave at the University of Notre Dame, in which he indicated that his Administration would honor the consciences of those who disagree with abortion, and draft sensible conscience clauses.

**B.     Regulatory Background – Defining "Preventive Care" and the Narrow Exemption**

62.     In a span of less than two years, Defendants promulgated the U.S. Government Mandate, subverting the Act's clear purpose to protect the rights of conscience.  The Mandate immediately prompted intense criticism and controversy, in response to which the Government has undertaken various revisions.  None of these revisions, however, alleviates the burden that the Mandate imposes on Plaintiffs' religious beliefs.  To the contrary, these revisions have resulted in a final rule that is significantly worse than the original one.

**(1) The Original Mandate**

63.     On July 19, 2010, Defendants issued interim final rules addressing the statutory requirement that group health plans provide coverage for women's "preventive care."  75 Fed. Reg. 41,726 (citing 42 U.S.C. § 300gg-13(a)(4)).  Initially, the rules did not define "preventive care," instead noting that "[t]he Department of HHS is developing these guidelines and expects to issue them no later than August 1, 2011."  *Id.* at 41,731.

64.     To develop the definition of "preventive care," HHS outsourced its deliberations to the Institute of Medicine ("IOM"), a non-governmental "independent" organization.  The IOM in turn created a "Committee on Preventive Services for Women," composed of 16 members who were selected in secret without any public input.  At least eight of the Committee members had founded, chaired, or worked with "pro-choice" advocacy groups (including five different Planned Parenthood entities) that have well-known political and ideological views, including strong animus toward Catholic teachings on abortion and contraception.

65.     Unsurprisingly, the IOM Committee invited presentations from several "pro-choice" groups, such as Planned Parenthood and the Guttmacher Institute (named for a former president of Planned Parenthood), without inviting any input from groups that oppose government-mandated coverage for abortion, contraception, and sterilization.  Instead, opponents were relegated to lining up for brief open-microphone sessions at the close of each meeting.

66.     At the close of this process, on July 19, 2011, the IOM issued a final report recommending that "preventive care" for women be defined to include "the full range of Food and Drug Administration-approved contraceptive methods, sterilization procedures, and patient education and counseling for [all] women with reproductive capacity."  Inst. Of Med., Clinical Preventive Services for Women: Closing the Gaps," at 218-219 (2011).

67.     The extreme bias of the IOM process spurred one member of the Committee, Dr. Anthony Lo Sasso, to dissent from the final recommendation, writing: "[T]he committee process for evaluation of the evidence lacked transparency and was largely subject to the preferences of the committee's composition.  Troublingly, the process tended to result in a mix of objective and subjective determinations filtered through a lens of advocacy."  *Id*. at 232.

68.     At a press briefing the next day, the chair of the IOM Committee fielded a question from a representative of the U.S. Conference of Catholic Bishops regarding the "coercive dynamic" of the Mandate, asking whether the Committee considered the "conscience rights" of those who would be forced to pay for coverage that they found objectionable on moral and religious grounds.  In response, the chair illustrated her cavalier attitude toward the religious-liberty issue, stating bluntly: "[W]e did not take into account individual personal feelings."  *See* Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For Women, Press Briefing (July 20, 2011), *available at* http://www.iom .edu/Reports/2011/Clinical-Preventive-Services-for-Women-Closing-the-Gaps.aspx.  The chair later expressed concern to Congress about considering religious objections to the Mandate because to do so would risk a "slippery slope" that could occur by "opening up that door" to religious liberty.  *See* Executive Overreach: The HHS Mandate Versus Religious Liberty:  Hearing Before the H. Comm. On the Judiciary, 112th Cong. (2012) (testimony of Linda Rosenstock, Chair, Inst. Of Med. Comm. On Preventive Servs. For Women).

69.     Less than two weeks after the IOM report, without pausing for notice and comment, HHS issued a press release on August 1, 2011, announcing that it would adopt the IOM's definition of "preventive care," including all "FDA-approved contraception methods and contraceptive counseling."  *See* U.S. Dept. of Health and Human Services, "Affordable Care Act

Ensures Women Receive Preventive Services at No Additional Cost," *available at* http://www.hhs.gov/news/press/2011pres/08/20110801b.html.  HHS ignored the religious, moral and ethical dimensions of the decision and the ideological bias of the IOM Committee and stated that it had "relied on independent physicians, nurses, scientists, and other experts" to reach a definition that was "based on scientific evidence."  Under the final "scientific" definition, the category of mandatory "preventive care" extends to "[a]ll Food and Drug Administration approved contraceptive methods, sterilization procedures, and patient education and counseling for all women with reproductive capacity."  *See* "Women's Preventive Services: Required Health Plan Coverage Guidelines," http://www.hrsa.gov/womensguidelines.

70.    The Government's definition of mandatory "preventive care" also includes abortion-inducing products.  For example, the FDA has approved "emergency contraceptives" such as the morning-after pill (otherwise known as Plan B), which can prevent an embryo from implanting in the womb, and Ulipristal (otherwise known as HRP 2000 or ella), which likewise can induce abortions.

71.    Shortly after announcing its definition of "preventive care," the Government proposed a narrow exemption from the Mandate for a small category of "religious employers" that met all of the following four criteria: "(1) The inculcation of religious values is the purpose of the organization"; "(2) The organization primarily employs persons who share the religious tenets of the organization"; "(3) The organization serves primarily persons who share the religious tenets of the organization"; and "(4) The organization is a nonprofit organization as described in section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 76 Fed. Reg. 46,621, 46,626 (Aug. 3, 2011) (codified at 45 C.F.R. § 147.130(a)(iv)(B)).

72.     As the Government itself admitted, this narrow exemption was intended to protect only "the unique relationship between a house of worship and its employees in ministerial positions." *Id.* at 46,623.  It provided no protection for religious universities, elementary and secondary schools, hospitals, and charitable organizations.

73.     The sweeping nature of the Mandate was subject to widespread and withering criticism.  Religious leaders from across the country protested that they should not be punished or considered less religious simply because they chose to live out their faith by serving needy members of the community who might not share their beliefs.  For example, the University of Dallas urged the Government to "expand the existing religious *employer* exemption to include religious *institutions* . . . beyond just churches and religious orders."  Comments of the University of Dallas at 2.

74.     Despite such pleas, the Government at first refused to reconsider its position.  Instead, the Government "finalize[d], without change," the narrow exemption as originally proposed.  77 Fed. Reg. at 8,729 (Feb. 15, 2012).  At the same time, the Government announced that it would offer a "a one-year safe harbor from enforcement" for religious organizations that remained subject to the Mandate. *Id.* at 8,728.  As noted by then-jBishop Farrell, the promised safe harbor effectively gave objecting religious institutions "one year to violate their consciences."  Most Reverend Kevin J. Farrell, D.D., The War Against Religious Freedom Escalates (Jan. 23, 2012), *available at* http://bishopkevinfarrell.org/blog/2012/01/the-war-against-religious-freedom-escalates/ (last visited August 15, 2013).

75.     A month later, under continuing public pressure, the Government issued an Advance Notice of Proposed Rulemaking ("ANPRM") that, it claimed, set out a solution to the religious-liberty controversy created by the Mandate.  77 Fed. Reg. 16,501 (Mar. 21, 2012).  The

ANPRM did not revoke the Mandate, and in fact reaffirmed the Government's view at the time that the "religious employer" exemption w*ould* not be changed.  *Id.* at 16,501-08.  Instead, the ANPRM offered hypothetical "possible approaches" that would, in the Government's view, somehow solve the religious-liberty problem without granting an exemption for objecting religious organizations.  *Id.* at 16,507.  As the U.S. Conference of Catholic Bishops soon recognized, however, any semblance of relief offered by the ANPRM was illusory. Although it was designed to "create an appearance of moderation and compromise, it [did] not actually offer any change in the Administration's earlier stated positions on mandated contraceptive coverage." *See* Comments of U.S. Conference of Catholic Bishops, at 3 (May 15, 2012), *available at* http://www.usccb.org/about/general-counsel/rulemaking/upload/comments-on-advance-notice-of-proposed-rulemaking-on-preventive-services-12-05-15.pdf.

### (2) The Government's Final Offer and the Empty "Accommodation"

76.    On February 1, 2013, the Government issued a Notice of Proposed Rulemaking ("NPRM"), setting forth in further detail its proposal to "accommodate" the rights of Plaintiffs and other religious organizations.  The NPRM, like the Government's previous proposals, was once again met with strenuous opposition, including over 400,000 comments.  For example, the U.S. Conference of Catholic Bishops stated that "the 'accommodation' still requires the objecting religious organization to fund or otherwise facilitate the morally objectionable coverage. Such organizations and their employees remain deprived of their right to live and work under a health plan consonant with their explicit religious beliefs and commitments."  Comments of U.S. Conference of Catholic Bishop, at 3 (Mar. 20, 2013), *available at* *http://www.usccb.org/about/general-counsel/rulemaking/upload/2013-NPRM-Comments-3-20-final.pdf.*

77.     Despite this opposition, on June 28, 2013, the Government issued a final rule that adopted substantially all of the NPRM's proposal without significant change.  See 78 Fed. Reg. 39870 (July 2, 2013) ("Final Rule").

78.     The Final Rule makes three changes to the Mandate.  As described below, even the revised Mandate places unlawful burdens on Plaintiffs and other religious organizations. Indeed, one change significantly *increases* that burden by significantly increasing the number of religious organizations subject to the Mandate.

79.     *First*, the Final Rule makes what the Government concedes to be a non-substantive, cosmetic change to the definition of "religious employer."  In particular, it eliminates the first three prongs of that definition, such that, under the new definition, an exempt "religious employer" is simply "an organization that is organized and operates as a nonprofit entity and is referred to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code of 1986, as amended." 78 Fed. Reg. at 39,874 (codified at 45 C.F.R. § 147.131(a)).  As the Government has admitted, this new definition does "not expand the universe of employer plans that would qualify for the exemption beyond that which was intended in the 2012 final rules."  78 Fed. Reg. at 8,461. Instead, it continues to "restrict[]the exemption primarily to group health plans established or maintained by churches, synagogues, mosques, and other houses of worship, and religious orders."  *Id.*  In this respect, the Final Rule mirrors the intended scope of the original "religious employer" exemption, which focused on "the unique relationship between a house of worship and its employees in ministerial positions."  76 Fed. Reg. at 46,623.  Religious organizations that have a broader mission are still not, in the Government's view, "religious employers."

80.     The "religious employer" exemption, moreover, creates an official, Government-favored category of religious groups that are exempt from the Mandate, while denying this

favorable treatment to all other religious groups.  The exemption applies only to those groups that are referred "to in section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code."  This category includes only (i) "churches, their integrated auxiliaries, and conventions or associations of churches," and (iii) "the exclusively religious activities of any religious order."  The IRS has adopted an intrusive 14-factor test to determine whether a group meets these qualifications.  *See Foundation of Human Understanding v. United States*, 88 Fed. Cl. 203, 220 (Fed. Cl. 2009). Among these 14 factors is whether the group has " a recognized creed and form of worship," "a definite and distinct ecclesiastical government," "a formal code of doctrine and discipline," "a distinct religious history," "an organization of ordained ministers" "a literature of its own," "established places of worship," "regular congregations, "regular religious services," "Sunday schools for the religious instruction of the young," and "schools for the preparation of its ministers." *Id.*  Not only do these factors favor some religious groups at the expense of others, but they also require the Government to make intrusive judgments regarding religious beliefs, practices, and organizational features to determine which groups fall into the favored category.

81.     *Second*, the Final Rule establishes an illusory "accommodation" for certain nonexempt objecting religious entities that qualify as "eligible organizations."  To qualify as an "eligible organization," a religious entity must (1) "oppose[] providing coverage for some or all of [the] contraceptive services," (2)  be "organized and operate[] as a non-profit entity"; (3) "hold[] itself out as a religious organization," and (4) self-certify that it meets the first three criteria, and provide a copy of the self-certification either to its insurance company or, if the religious organization is self-insured, to its third-party administrator.  26 C.F.R. § 54.9816-2713A(a).  The provision of this self-certification then automatically requires the insurance issuer or third-party administrator to provide or arrange "payments for contraceptive services" for the

organization's employees, without imposing any "cost-sharing requirements (such as a copayment, coinsurance, or a deductible)." *Id*. § 54.9816-2713A(b)(2), (c)(2).  The objectionable coverage, moreover, is directly tied to the organization's health plan, lasting only as long as the employee remains on that plan.  *See* 29 C.F.R. § 2590.715-2713A(d); 45 C.F.R. § 147.131(c)(2)(i)(B).  In addition, self-insured organizations are prohibited from "directly or indirectly, seek[ing] to influence the[ir] third party administrator's decision" to provide or procure contraceptive services.  26 C.F.R. § 54.9815–2713.

82.   This so-called "accommodation" fails to relieve the burden on religious organizations.  Under the original version of the Mandate, a non-exempt religious organization's decision to offer a group health plan resulted in the provision of  coverage for abortion-inducing products, contraception, sterilization, and related counseling.  Under the Final Rule, a non-exempt religious organization's decision to offer a group health plan still results in the provision of coverage—now in the form of "payments"—for abortion-inducing products, contraception, sterilization, and related counseling.  *Id*. § 54.9816-2713A(b)-(c).  In both scenarios, Plaintiffs' decision to provide a group health plan triggers the provision of "free" contraceptive coverage to their employees in a manner contrary to their beliefs.  The provision of the objectionable products and services are directly tied to Plaintiffs' insurance policies, as the objectionable "payments" are available only so long as an employee is on the organization's health plan. *See* 29 C.F.R. § 2590.715-2713A(d) (for self-insured employers, the third-party administrator "will provide or arrange separate payments for contraceptive services . . . for so long as [employees] are enrolled in [their] group health plan"); 45 C.F.R. § 147.131(c)(2)(i)(B) (for employers that offer insured plans, the insurance issuer must "[p]rovide separate payments for any contraceptive services . . . for plan participants and beneficiaries for so long as they remain enrolled in the plan").  For self-

insured organizations, moreover, the self-certification constitutes the religious organization's "*designation* of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits." 78 Fed. Reg. at 39,879 (emphasis added). Thus, employer health plans offered by non-exempt religious organizations are the vehicle by which "free" abortion-inducing products, contraception, sterilization, and related counseling are delivered to the organizations' employees.

83. Needless to say, this shell game does not address Plaintiffs' fundamental religious objection to improperly facilitating access to the objectionable products and services. The Mandate coerces Plaintiffs, through threats of crippling fines and other pressure, into facilitating access to contraception, abortion-inducing products, sterilization, and related counseling for their employees, contrary to their sincerely held religious beliefs.

84. The so-called "accommodation," moreover, requires Plaintiffs to cooperate in the provision of objectionable coverage in other ways as well. For example, in order to be eligible for the so-called "accommodation," Plaintiffs must provide a "certification" to their insurance provider setting forth their religious objections to the Mandate. The provision of this "certification," in turn, automatically triggers an obligation on the part of the insurance provider to provide Plaintiffs' employees with the objectionable coverage. A religious organization's self-certification, therefore, is a trigger and but-for cause of the objectionable coverage.

85. The Mandate also requires Plaintiffs to subsidize the objectionable products and services.

86. For organizations that procure insurance through a separate insurance provider, the Government asserts that the cost of the objectionable products and services will be "cost neutral" and, therefore, that Plaintiffs will not actually be paying for it, notwithstanding the fact

that Plaintiffs' premiums are the only source of funding that their insurance providers will receive for the objectionable products and services.

87.    The Government's "cost-neutral" assertion, however, is implausible.  It rests on the assumption that cost "savings" from "fewer childbirths" will be at least as large as the direct costs of paying for contraceptive products and services and the costs of administering individual policies.  78 Fed. Reg. at 8,463.  Some employees, however, will choose not to use contraception notwithstanding the Mandate.  Others would use contraception regardless of whether it is being paid for by an insurance company.  And yet others will shift from less expensive to more expensive products once coverage is mandate and cost-sharing is prohibited.  Consequently, there can be no assurance that cost "savings" from "fewer childbirths" will offset the cost of providing contraceptive services.

88.    More importantly, even if the Government's "cost-neutral" assertion were true, it is irrelevant.  The so-called "accommodation" is nothing more than a shell game.  Premiums previously paid by the objecting employers to cover, for example, "childbirths," will now be redirected to pay for contraceptive products and services.  Thus, the objecting employer is still required to pay for the objectionable products and services.

89.    For self-insured organizations, the Government's "cost-neutral" assumption is likewise implausible.  The Government asserts that third-party administrators required to provide or procure the objectionable products and services will be compensated by reductions in user fees that they otherwise would pay for participating in federally-facilitated health exchanges. *See* 78 Fed. Reg. at 39,882.   Such fee reductions are to be established through a highly regulated and bureaucratic process for evaluating, approving, and monitoring fees paid in compensation to third-party administrators.   Such regulatory regimes, however, do not fully compensate the

regulatory entities for the costs and risks incurred.   As a result, few if any third-party administrators are likely to participate in this regime, and those that do are likely to increase fees charged to the self-insured organizations.

90.   Either way, as with insured plans, self-insured organizations likewise will be required to subsidize contraceptive products and services notwithstanding the so-called "accommodation."

91.   For all of these reasons, the U.S. Government Mandate continues to require Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization, and related education and counseling, in violation of their sincerely-held religious beliefs.

92.   *Third,* the Final Rule actually *increases* the number of religious organizations that are subject to the Mandate.   Under the Government's initial interpretation of the "religious employer" exemption, if a nonexempt religious organization "provided health coverage for its employees through" a plan offered by a separate, "affiliated" organization that was "exempt from the requirement to cover contraceptive services, then neither the [affiliated organization] nor the [nonexempt entity would be] required to offer contraceptive coverage to its employees."   77 Fed. Reg. 16,501, 16,502 (Mar. 21, 2012).

93.   For example, the Diocese operates an insurance plan that covers not only the Diocese itself, but Plaintiff Catholic Charities.   Under the Government's initial interpretation of the religious employer exemption, if the Diocese was an exempt "religious employer," then Catholic Charities received the benefit of that exemption, regardless of whether it independently qualified as a "religious employer," since it could continue to participate in the Diocese's exempt

plan.  Catholic Charities, therefore, could benefit from the Diocese's exemption even if by itself it could not meet the Government's unprecedentedly narrow definition of "religious employer."

94.     The Final Rule eliminates this safeguard.   Instead, it provides that "each employer" must "independently meet the definition of eligible organization or religious employer in order to take advantage of the accommodation or the religious employer exemption with respect to its employees and their covered dependents."  78 Fed. Reg. at 39,886.  *See also* 78 Fed. Reg. at 8,467.  Since Catholic Charities does not meet the Government's narrow definition of a "religious employer," it is now subject to the U.S. Government Mandate.

95.     Moreover, since Catholic Charities is part of the Diocese's insurance plan, the Diocese is now required by the Mandate to do one of two things:   since Catholic Charities participates in the diocesan insurance plan, the Diocese would be forced to sponsor a plan that will provide Catholic Charities' employees with access to "free" contraception, abortion-inducing products, sterilization, and related counseling.   Alternatively, the Diocese must expel Catholic Charities from its insurance plan and thereby subject Catholic Charities to massive fines unless it enters into an arrangement with another insurance provider that will, in turn, provide or procure the objectionable products and services.

96.     In this respect, the Mandate seeks to divide the Catholic Church.  The Church's faith in action, carried out through its charitable and educational arms, is every bit as central to the Church's religious mission as is the administration of the Sacraments.  In the words of Pope Benedict, "[t]he Church cannot neglect the service of charity any more than she can neglect the Sacraments and the Word."  Yet the Mandate seeks to separate these consubstantial aspects of the Catholic faith, treating one as "religious" and the other as not.  The Mandate therefore deeply intrudes into internal Church governance.

97.     In sum, the revised Mandate imposes a burden on the Plaintiffs' religious beliefs; it in fact makes that burden significantly worse by increasing the number of religious organizations that are subject to the Mandate.  The U.S. Government Mandate, therefore, requires Plaintiffs to act contrary to their sincerely held religious beliefs.

**III.     THE U.S. GOVERNMENT MANDATE IMPOSES A SUBSTANTIAL BURDEN ON PLAINTIFFS' RELIGIOUS LIBERTY**

**A.     The U.S. Government Mandate Substantially Burdens Plaintiffs' Religious Beliefs**

98.    Since the founding of this country, our law and society have recognized that individuals and institutions are entitled to freedom of conscience and religious practice.  Absent a compelling reason, no government authority may compel any group or individual to act contrary to their religious beliefs.  As noted by Thomas Jefferson, "[n]o provision in our Constitution ought to be dearer to man than that which protects the rights of conscience against the enterprises of civil authority."

99.    The U.S. Government Mandate violates Plaintiffs' rights of conscience by forcing them to participate in an employer-based scheme to provide access to products and services to which they strenuously object on moral and religious grounds.

100.    It is a core tenet of Plaintiffs' religion that abortion, contraception, and sterilization are serious moral wrongs.

101.    Plaintiffs' Catholic beliefs therefore prohibit them from providing, paying for, and/or facilitating access to abortion-inducing products, contraception, or sterilization.

102.    As a corollary, Plaintiffs' Catholic beliefs prohibit them contracting with an insurance company or third-party administrator that will, as a result, provide or procure the objectionable products and services to Plaintiffs' employees.

103.    Plaintiffs' beliefs are deeply and sincerely held.

104.    The U.S. Government Mandate, therefore, requires Plaintiffs to do precisely what their sincerely held religious beliefs prohibit—provide, pay for, and/or facilitate access to objectionable products and services or else incur crippling sanctions.

105.    The U.S. Government Mandate therefore imposes a substantial burden on plaintiffs' religious beliefs.

106.    The Mandate's exemption for "religious employers" does not alleviate the burden.

107.    The "religious employers" exemption does not apply to Plaintiff Catholic Charities.

108.    Although the Diocese is a "religious employer," the Mandate still forces it either to (1) sponsor a plan that will provide Catholic Charities with access to the objectionable products and services, or (2) no longer extend its plan to these organizations, subjecting them to massive fines if they do not contract with another insurance provider that will provide the objectionable coverage.

109.    The first option forces the Diocese to act contrary to its sincerely-held religious beliefs. The second option compels the Diocese to submit to the government's interference with its structure and internal operations by accepting a construct that divides churches from their ministries.

110.    The so-called "accommodation" does not alleviate the burden on Plaintiffs' sincerely held religious beliefs.

111.    Notwithstanding the so-called "accommodation," Plaintiffs are still required to provide, pay for, and/or facilitate access to the objectionable products and services.

112.    Plaintiffs' Catholic beliefs do not simply prohibit them from using or directly paying for the objectionable coverage. Their beliefs also prohibit them from facilitating access to the objectionable products and services in the manner required by the Mandate.

113.    Finally, the Plaintiffs cannot avoid the U.S. Government Mandate without incurring significant adverse consequences.  If they eliminate their employee health plans, they are subject to annual fines of $2,000 per full-time employee and would suffer a disadvantage in employee recruitment and retention. If they keep their health plans but refuse to provide or facilitate the objectionable coverage, they are subject to daily fines of $100 a day per affected beneficiary.   These adverse consequences therefore coerce Plaintiffs into violating their religious beliefs.

114.    In short, while the President claims to have "found a solution that works for everyone" and that ensures that "religious liberty will be protected," his promised "accommodation" does neither.   Unless and until this issue is definitively resolved, the U.S. Government Mandate does and will continue to impose a substantial burden on Plaintiffs' religious beliefs.

## B.    The U.S. Government Mandate Is Not a Neutral Law of General Applicability

115.    The U.S. Government Mandate is not a neutral law of general applicability.   It offers multiple exemptions from its requirement that employer-based health plans include or facilitate coverage for abortion-inducing products, sterilization, contraception, and related education and counseling.  It was, moreover, implemented by and at the behest of individuals and organizations who disagree with Plaintiffs' religious beliefs regarding abortion and contraception, and thus targets religious organizations for disfavored treatment.

116.   For example, the Mandate exempts all "grandfathered" plans from its requirements, thus excluding tens of millions of people from the mandated coverage.   As the government has admitted, while the numbers are expected to diminish over time, "98 million individuals will be enrolled in grandfathered group health plans in 2013."   75 Fed. Reg. 41726,41732 (July 19, 2010). Elsewhere, the government has put the number at 87 million. See "Keeping       the       Health       Plan       You       Have"       (June       14,       2010), http://www.healthcare.gov/news/factsheets/2010/06/keeping-the-health-plan-you-have-grandfathered.html.   And according to one district court last year, "191 million Americans belong[ed] to plans which may be grandfathered under the ACA."   *Newland v. Sebelius*, 881 F. Supp. 2d 1287, 1291 (D. Colo. 2012).

117.   Similarly, small employers (*i.e.*, those with fewer than 50 employees) are exempt from certain enforcement mechanisms to compel compliance with the Mandate. *See* 26 U.S.C. § 4980H(a) (exempting small employers from the assessable payment for failure to provide health coverage).

118.   In addition, the Mandate exempts an arbitrary subset of religious organizations that qualify for tax-reporting exemptions under Section 6033 of the Internal Revenue Code.   The Government cannot justify its protection of the religious-conscience rights of the narrow category of exempt "religious employers," but not of Plaintiffs and other religious organizations that remain subject to the Mandate.

119.   The U.S. Government Mandate, moreover, was promulgated by Government officials, and supported by non-governmental organizations, who strongly oppose certain Catholic teachings and beliefs.   For example, on October 5, 2011, Defendant Sebelius spoke at a fundraiser for NARAL Pro-Choice America.   Defendant Sebelius has long supported abortion

rights and criticized Catholic teachings and beliefs regarding abortion and contraception. NARAL Pro-Choice America is a pro-abortion organization that likewise opposes many Catholic teachings. At that fundraiser, Defendant Sebelius criticized individuals and entities whose beliefs differed from those held by her and the other attendees of the NARAL Pro-Choice America fundraiser, stating: "Wouldn't you think that people who want to reduce the number of abortions would champion the cause of widely available, widely affordable contraceptive services? Not so much." In addition, the Mandate was modeled on a California law that was motivated by discriminatory intent against religious groups that oppose contraception.

120. Consequently, Plaintiffs allege that the purpose of the U.S. Government Mandate, including the narrow exemption, is to discriminate against religious institutions and organizations that oppose abortion and contraception.

### C. The U.S. Government Mandate Is Not the Least Restrictive Means of Furthering a Compelling Governmental Interest

121. The U.S. Government Mandate is not narrowly tailored to serve a compelling governmental interest.

122. The Government has no compelling interest in forcing Plaintiffs to violate their sincerely held religious beliefs by requiring them to participate in a scheme for the provision of abortion-inducing products, sterilization, contraceptives, and related education and counseling. The Government itself has relieved numerous other employers from this requirement by exempting grandfathered plans and plans of employers it deems to be sufficiently religious. Moreover, these services are widely available in the United States. The U.S. Supreme Court has held that individuals have a constitutional right to use such services. And nothing that Plaintiffs do inhibits any individual from exercising that right.

123.    Even assuming the interest was compelling, the Government has numerous alternative means of furthering that interest without forcing Plaintiffs to violate their religious beliefs.  For example, the Government could have provided or paid for the objectionable services itself through other programs established by a duly enacted law.  Or, at a minimum, it could have created a broader exemption for religious employers, such as those found in numerous state laws throughout the country and in other federal laws.  The Government therefore cannot possibly demonstrate that requiring Plaintiffs to violate their consciences is the least restrictive means of furthering its interest.

124.    The U.S. Government Mandate, moreover, would simultaneously undermine both religious freedom—a fundamental right enshrined in the U.S. Constitution—and access to the wide variety of social and educational services that Plaintiffs provide.  As President Obama acknowledged in his announcement of February 10, 2012, religious organizations like Plaintiffs do "more good for a community than a government program ever could."  The U.S. Government Mandate, however, puts these good works in jeopardy.

125.    That is unconscionable.  Accordingly, Plaintiffs seek a declaration that the U.S. Government Mandate cannot lawfully be applied to Plaintiffs, an injunction barring its enforcement, and an order vacating the Mandate.

## IV.    THE U.S. GOVERNMENT MANDATE THREATENS PLAINTIFFS WITH IMMINENT INJURY THAT SHOULD BE REMEDIED BY A COURT

126.    The U.S. Government Mandate is causing serious, ongoing hardship to Plaintiffs that merits relief now.

127.    On June 28, 2013, Defendants finalized the U.S. Government mandate, including the narrow "religious employer" exemption and the so-called "accommodation" proposed in the

NPRM.  By the terms of the Final Rule, Plaintiffs must comply with the Mandate for their plan years beginning on or after January 1, 2014.

128.    Defendants have given no indication that they will not enforce the essential provisions of the Mandate that impose a substantial burden on Plaintiffs' rights.  Consequently, absent the relief sought herein, Plaintiffs will be required to provide, pay for, and/or facilitate access to contraception, abortion-inducing products, sterilization, and related education and counseling, in violation of their sincerely held religious beliefs.

129.    The U.S. Government Mandate is also harming Plaintiffs in other ways.

130.    Health plans do not take shape overnight.  A number of analyses, negotiations, and decisions must occur each year before Plaintiffs can offer a health benefits package to their employees.  For example, an employer using an outside insurance issuer must work with actuaries to evaluate its funding reserves, and then negotiate with the insurer to determine the cost of the products and services it wants to offer its employees.  An employer that is self-insured, after consulting with its actuaries, must similarly negotiate with its third-party administrator ("TPA").

131.    Under normal circumstances, Plaintiffs must begin the process of determining their health care package for a plan year at least several months before the plan year begins. The multiple levels of uncertainty surrounding the U.S. Government Mandate make this already lengthy process even more complex.

132.    In addition, if Plaintiffs do not comply with the U.S. Government Mandate, they may be subject to government fines and penalties.  The hardship placed on Plaintiffs by such fines and penalties would be immense, given that most of their income comes from grants, fundraisers, and the free-will offerings of the Catholic people.  Further, Plaintiffs require significant time to budget for such additional expenses.

133. The U.S. Government Mandate and its uncertain legality, moreover, undermine Plaintiffs' ability to hire and retain employees, thus placing them at a competitive disadvantage in the labor market relative to organizations that do not have a religious objection to the Mandate.

134.   Plaintiffs therefore need judicial relief now in order to prevent the serious, ongoing harm that the U.S. Government Mandate is already imposing on them.

## V.   CAUSES OF ACTION

### COUNT I
### Substantial Burden on Religious Exercise
### in Violation of RFRA

135.   Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

136.   RFRA prohibits the Government from substantially burdening an entity's exercise of religion, even if the burden results from a rule of general applicability, unless the Government demonstrates that the burden furthers a compelling governmental interest and is the least restrictive means of furthering that interest.

137.   RFRA protects organizations as well as individuals from Government-imposed substantial burdens on religious exercise.

138.   RFRA applies to all federal law and the implementation of that law by any branch, department, agency, instrumentality, or official of the United States.

139.   The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs.

140.   The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

141.    The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

142.    Requiring Plaintiffs to comply with the U.S. Government Mandate is not the least restrictive means of furthering a compelling governmental interest.

143.    By enacting and threatening to enforce the U.S. Government Mandate against Plaintiffs, Defendants have violated RFRA.

144.    Plaintiffs have no adequate remedy at law.

145.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

### COUNT II
### Substantial Burden on Religious Exercise in Violation of
### the Free Exercise Clause of the First Amendment

146.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

147.    The Free Exercise Clause of the First Amendment prohibits the Government from substantially burdening an entity's exercise of religion.

148.    The Free Exercise Clause protects organizations as well as individuals from Government-imposed burdens on religious exercise.

149.    The U.S. Government Mandate requires Plaintiffs to provide, pay for, and/or facilitate access to abortion-inducing products, contraception, sterilization procedures, and related counseling, in a manner that is directly contrary to their religious beliefs.

150.    The U.S. Government Mandate substantially burdens Plaintiffs' exercise of religion.

151.    The U.S. Government Mandate is not a neutral law of general applicability, because it is riddled with exemptions for which there is not a consistent, legally defensible basis. It offers multiple exemptions from its requirement that employer-based health plans include or

facilitate access to abortion-inducing products, sterilization, contraception, and related education and counseling.

152.    The U.S. Government Mandate is not a neutral law of general applicability because it was passed with discriminatory intent.

153.    The U.S. Government Mandate implicates constitutional rights in addition to the right to free exercise of religion, including, for example, the rights to free speech, free association, and freedom from excessive government entanglement with religion.

154.    The Government has no compelling governmental interest to require Plaintiffs to comply with the U.S. Government Mandate.

155.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

156.    By enacting and threatening to enforce the U.S. Government Mandate, the Government has burdened Plaintiffs' religious exercise in violation of the Free Exercise Clause of the First Amendment.

157.    Plaintiffs have no adequate remedy at law.

158.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

**COUNT III**
**Compelled Speech in Violation of**
**the Free Speech Clause of the First Amendment**

159.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

160.    The First Amendment protects against the compelled affirmation of any religious or ideological proposition that the speaker finds unacceptable.

161.    The First Amendment protects organizations as well as individuals against compelled speech.

162.    Expenditures are a form of speech protected by the First Amendment.

163.    The First Amendment speakers from being forced to support a viewpoint that conflicts with their religious beliefs.

164.    The U.S. Government Mandate would compel Plaintiffs to provide health care plans to their employees that include or facilitate access to products and services that violate their religious beliefs.

165.    The U.S. Government Mandate would compel Plaintiffs to subsidize, promote, and facilitate education and counseling services regarding these objectionable products and services.

166.    The U.S. Government Mandate would compel Plaintiffs to issue a certification of its beliefs that, in turn, would result in the provision of access to objectionable products and services to Plaintiffs' employees.

167.    By imposing the U.S. Government Mandate, Defendants are compelling Plaintiffs to publicly subsidize or facilitate the activity and speech of private entities that are contrary to their religious beliefs, and compelling Plaintiffs to engage in speech that will result in the provision of access to objectionable products and services to Plaintiffs' employees.

168.    The U.S. Government Mandate is viewpoint-discriminatory and subject to strict scrutiny.

169.    The U.S. Government Mandate furthers no compelling governmental interest.

170.    The U.S. Government Mandate is not narrowly tailored to further a compelling governmental interest.

171.    Plaintiffs have no adequate remedy at law.

172.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT IV
### Prohibition of Speech
### in Violation of the First Amendment

173.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

174.    The First Amendment protects the freedom of speech, including the right of religious groups to speak out to persuade others to refrain from engaging in conduct that may be considered immoral.

175.    The Mandate violates the First Amendment freedom of speech by imposing a gag order that prohibits Plaintiffs from speaking out in any way that might "influence," "directly or indirectly," the decision of a third-party administrator to provide or procure contraceptive products and services to Plaintiffs' employees.

176.    Plaintiffs have no adequate remedy at law.

177.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT V
### Official "Church" Favoritism and Excessive Entanglement with Religion
### in Violation of the Establishment Clause of the First Amendment

178.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

179.    The Establishment Clause of the First Amendment prohibits the Government from adopting an official definition of a "religious employer" that favors some religious groups while excluding others.

180.    The Establishment Clause also prohibits the Government from becoming excessively entangled in the affairs of religious groups by scrutinizing their beliefs, practices, and organizational features to determine whether they meet the Government's favored definition.

181.    The "religious employer" exemption violates the Establishment Clause in two ways.

182.    First, it favors some religious groups over others by creating an official definition of "religious employers."  Religious groups that meet the Government's official definition receive favorable treatment in the form of an exemption from the Mandate, while other religious groups do not.

183.    Second, even if it were permissible for the Government to favor some religious groups over others, the "religious employer" exemption would still violate the Establishment Clause because it requires the Government to determine whether groups qualify as "religious employers" based on intrusive judgments about their beliefs, practices, and organizational features.  The exemption turns on an intrusive 14-factor test to determine whether a group meets the requirements of section 6033(a)(1) and section 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code.  These 14 factors probe into matters such as whether a religious group has "a distinct religious history" or "a recognized creed and form of worship."  But it is not the Government's place to determine whether a group's religious history is "distinct," or whether the group's "creed and form of worship" are "recognized."  By directing the Government to partake of such inquiries, the "religious employer" exemption runs afoul of the Establishment Clause prohibition on excessive entanglement with religion.

184.    Plaintiffs have no adequate remedy at law.

185.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

## COUNT VI
### Interference in Matters of Internal Church Governance in Violation of the Religion Clauses of the First Amendment

186.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

187.    The Free Exercise Clause and Establishment Clause and the Religious Freedom Restoration Act protect the freedom of religious organizations to decide for themselves, free from state interference, matters of church government as well as those of faith and doctrine.

188.    Under these Clauses, the Government may not interfere with a religious organization's internal decisions concerning the organization's religious structure, ministers, or doctrine.

189.    Under these Clauses, the Government may not interfere with a religious organization's internal decision if that interference would affect the faith and mission of the organization itself.

190.    Plaintiffs are religious organizations affiliated with the Roman Catholic Church.

191.    The Catholic Church views abortion, sterilization, and contraception as intrinsically immoral, and prohibits Catholic organizations from condoning or facilitating those practices.

192.    Plaintiffs have abided and must continue to abide by the decision of the Catholic Church on these issues.

193.    The Government may not interfere with or otherwise question the final decision of the Catholic Church that its religious organizations must abide by these views.

194.    Plaintiffs have therefore made the internal decision that the health plans they offer to their employees may not cover, subsidize, or facilitate access to abortion, sterilization, or contraception.

195.    The Diocese has further made the internal decision that Catholic Charities (as an adopting employer) may offer their employees health-insurance coverage through the Diocese's

plan, which allows the Diocese to ensure that this quintessentially Catholic organization does not offer access to services that are contrary to Catholic teaching.

196.    The U.S. Government Mandate interferes with Plaintiffs' internal decisions concerning their structure and mission by requiring them to facilitate practices that directly conflict with Catholic beliefs.

197.    The U.S. Government Mandate's interference with Plaintiffs' internal decisions affects their faith and mission by requiring them to facilitate practices that directly conflict with their religious beliefs.

198.    Because the U.S. Government Mandate interferes with the internal decision-making of Plaintiffs in a manner that affects Plaintiffs' faith and mission, it violates the Establishment Clause and the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act.

199.    Plaintiffs have no adequate remedy at law.

200.    Defendants are imposing an immediate and ongoing harm on Plaintiffs that warrants relief.

<u>**COUNT VII**</u>
<u>**Illegal Action in Violation of the APA**</u>

201.    Plaintiffs repeat and re-allege each of the foregoing allegations in this Complaint.

202.    The APA requires that all Government agency action, findings, and conclusions be "in accordance with law."

203.    The U.S. Government Mandate, its exemption for "religious employers," and its so-called "accommodation" for "eligible" religious organizations are illegal and therefore in violation of the APA.

204.    The Weldon Amendment states that "[n]one of the funds made available in this Act [to the Department of Labor and the Department of Health and Human Services] may be made available to a Federal agency or program . . . if such agency, program, or government subjects any institutional or individual health care entity to discrimination on the basis that the health care entity does not provide, pay for, provide coverage of, or refer for abortions." Consolidated Appropriations Act of 2012, Pub. L. No. 112-74, div. F, tit. V, § 507(d)(1), 125 Stat. 786, 1111 (2011).

205.    The Affordable Care Act contains no clear expression of an affirmative intention of Congress that employers with religiously motivated objections to the provision of health plans that include access to abortion-inducing products, sterilization, contraception, or related education and counseling should be required to provide such plans.

206.    The U.S. Government Mandate requires employer-based health plans to provide access to abortion-inducing products, contraception, sterilization, and related education.  It does not permit employers or issuers to determine whether the plan covers abortion, as the Act requires.  By issuing the U.S. Government Mandate, Defendants have exceeded their authority, and ignored the direction of Congress.

207.    The U.S. Government Mandate violates RFRA.

208.    The U.S. Government Mandate violates the First Amendment.

209.    The U.S. Government Mandate is not in accordance with law and thus violates 5 U.S.C. § 706(2)(A).

210.    Plaintiffs have no adequate or available administrative remedy, or, in the alternative, any effort to obtain an administrative remedy would be futile.

211.    Plaintiffs have no adequate remedy at law.

212.    Defendants' failure to act in accordance with law imposes an immediate and ongoing harm on Plaintiffs that warrants relief.

**WHEREFORE,** Plaintiffs respectfully pray that this Court:

1.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under RFRA;

2.    Enter a declaratory judgment that the U.S. Government Mandate violates Plaintiffs' rights under the First Amendment;

3.    Enter a declaratory judgment that the U.S. Government Mandate was promulgated in violation of the APA;

4.    Enter an injunction prohibiting the Defendants from enforcing the U.S. Government Mandate against Plaintiffs;

5.    Enter an order vacating the U.S. Government Mandate;

6.    Award Plaintiffs attorneys' and expert fees under 42 U.S.C. § 1988; and

7.    Award all other relief as the Court may deem just and proper.

By: /s/ Randal G. Cashiola
     Randal G. Cashiola
     Texas State Bar No. 03966802
     rcashiola@cashiolalaw.com
     CASHIOLA & BEAN
     2090 Broadway, Suite A
     Beaumont, Texas 77701
     (409) 813-1443 telephone
     (409) 813-1467 facsimile

     *Attorney-in-Charge  for Plaintiffs*