IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| CATHOLIC DIOCESE OF BEAUMONT AND CATHOLIC CHARITIES OF SOUTHEAST TEXAS, INC. | § § § § | |
| *Plaintiffs,* | § § | CIVIL ACTION No. 1:13-cv-709 |
| v. | § § | JUDGE RON CLARK |
| KATHLEEN SEBELIUS, SECRETARY, U.S. DEPT. OF HEALTH AND HUMAN SERVICES, ET AL. | § § § § | |
| *Defendants.* | § | |

## **MEMORANDUM AND ORDER**

Plaintiffs, the Catholic Diocese of Beaumont and Catholic Charities of Southeast Texas, Inc., filed suit against Defendants United States Departments of Health and Human Services, Labor, and Treasury, seeking an injunction against enforcement of a portion of the Patient Protection and Affordable Care Act that requires employers to provide their employees with a health plan that covers all FDA-approved contraceptive methods, sterilization procedures, and patient education and counseling ("contraceptive services"). The Government asserts that Plaintiffs lack standing, and alternatively failed to show a violation of the Religious Freedom Restoration Act, a violation of their Free Exercise rights, or a violation of their Free Speech rights.

This case is one of many similar cases brought by religious organizations across the country. Some district courts have found for the plaintiffs,[1] while others have found for the

---

[1] *See e.g., E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, at *42-43 (S.D. Tex. Dec. 27, 2013); *Southern Nazarene University v. Sebelius,* No. 13-cv-1015-F (W.D. Okla. Dec. 23, 2013); *Geneva College v. Sebelius,* No. 12-cv-00207 (W.D. Pa. Dec. 23 2013); *Legatus v. Sebelius,* No. 12-cv-12061 (E.D. Mich. Dec. 20, 2013); *Roman Catholic Archbishop of Washington v.*

Government.[2] As detailed below, this court's analysis and conclusions are in line with those of the Honorable Lee H. Rosenthal in in *E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, at *42-43 (S.D. Tex. Dec. 27, 2013), the Honorable Brian M. Cogan in *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12-cv-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) and the Honorable Arthur J. Schwab in *Zubik v. Sebelius*, No. 13-cv-01459 (W.D. Pa. Nov. 21, 2013).

Requiring the head of a religious organization to sign a putatively correct statement of religious belief, which the Government has defined to authorize a third party to take an action that is contrary to those religious beliefs, imposes a substantial burden on the free exercise of religion. That conclusion is not changed by the Government's argument that, at present, it does not have the power to compel the third party to act. The court finds that Plaintiffs have demonstrated that they have standing and have met their burden for issuance of a permanent injunction.

---

*Sebelius,* No. 13-cv- (D.D.C. Dec. 20, 2013) (enjoining mandate on "compelled silence" argument; but otherwise denying injunctive relief), emergency motion for expedited briefing for injunction filed Dec. 23 2013, No. 13-5371 (D.C. Cir.); *Reaching Souls Int'l v. Sebelius,* No. 13-cv-01092 (W.D. Okla. Dec. 20, 2013); *Reaching Souls Int'l, Inc. v. Sebelius,* No. 5:13-cv-1092 (W.D. Ok. Dec. 20, 2013); *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12-cv-2542, 2013 WL 6579764 (E.D.N.Y. Dec. 16, 2013) (holding that the accommodation violates RFRA and enjoining the mandate); *Persico v. Sebelius*, No. 13-cv-00303 (W.D. Pa. Nov. 21, 2013); *Zubik v. Sebelius*, No. 13-cv-01459 (W.D. Pa. Nov. 21, 2013).

[2] *See, e.g.*, *Catholic Diocese of Nashville v. Sebelius*, No. 3:13-cv-1303 (M.D. Tenn. Dec. 26, 2013); *University of Notre Dame v.Sebelius,* No. 13-cv-01276 (N.D. Ind. Dec. 20. 2013), emergency motion for injunction filed Dec. 23, 2013, No 13-3853 (7th Cir.); *Priests for Life v. U.S. Dep't of Health & Human Servs.*, No. 13-cv-1261, 2013 WL 6672400 (D.D.C. Dec. 19, 2013) (holding that the accommodation does not create a RFRA substantial burden), emergency motion for injunction filed Dec. 20, 2013, No. 13- 5368 (D.C. Cir.).

## I. Background

Plaintiffs filed suit on December 10, 2013. Because of the January 1, 2014 deadline the court ordered early consultation by counsel on the issues. With input from counsel at the management conference, the court entered an expedited briefing schedule and set a hearing for December 30, 2013. Defendants moved for dismissal or in the alternative, for summary judgment. The Government filed the administrative record, and the court has reviewed those portions designated by counsel in the pleadings and papers on file. The parties have also filed "Parties Stipulated Preliminary Findings." [Doc. # 26].

At the hearing Plaintiffs presented witnesses, live and by deposition, and the court heard argument of counsel. The parties agreed that the record had been fully developed and only questions of law existed. The parties also agreed at the hearing that they did not object to the court consolidating that hearing with a trial on the merits, and making a final determination as to matters raised by Defendants' motion to dismiss or alternatively for summary judgment and Plaintiffs' request for an injunction based on the record before the court. [Transcript of Hearing on December 30, 2013 (Tr.) pp. 75-77].[3] *See* Fed. R. Civ. P. 65(a)(2).

The court did not scour the administrative record in a search for facts that support either party, but it has considered the portions that have been specifically referenced by the parties in their motions and briefing. *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996) (citations omitted). The Government argues that the court should limit its review of the facts to the administrative record, and presumably the stipulated facts. Since Plaintiffs are alleging interference with important constitutional rights, the court will consider the evidence presented

---

[3] A final, certified transcript has not been prepared, so the page numbers in this Memorandum Order are those of a rough transcript. They may differ from those of any final transcript that is prepared.

3

by Plaintiffs. *See McNary v. Haitian Refugee Ctr.*, 498 U.S. 479, 493-94, 111 S. Ct. 888, 896-97 (1991).

The facts pertinent to this case are virtually uncontroverted, and very similar to the facts in all of the other opinions the court has seen so far. To save space the court will adopt the Parties Stipulated Preliminary Findings [Doc # 26] as findings of fact of the court. The court also finds that the statements concerning the religious beliefs of Catholics (including Plaintiffs) the teachings of the Catholic Church, and the role that Plaintiff Catholic Charities plays in the ministry of Plaintiff Roman Catholic Diocese of Beaumont, set out in the "Declaration of Bishop Curtis J Guillory, S.V.D., D.D." [Doc # 3-1] factually set out the sincere religious beliefs of Plaintiffs and their respective members. [Bishop Guillory, Tr. p. 4]. The court sustains the Government's objection to those statements that express Bishop Guillory's opinions as to the legal effect of, or proper legal interpretation of, the regulations and statutes in question, at paragraphs 15, 17, 19, 21, and the first sentence of 22, and will not consider those as facts.

A. <u>Findings of Fact as to Plaintiffs' Sincere Religious Beliefs</u>

In summary, Plaintiffs are both entities affiliated with the Roman Catholic Church. In their complaint and motion for preliminary injunction, they allege that the contraceptive mandate forces them to choose between violating central elements of their religious faith and paying substantial financial penalties. For nearly two thousand years the Catholic Church "has taught that life is sacred from conception to death and any – whether it's medicine or instruments that would prevent life, we consider morally wrong." [Bishop Guillory, Tr. pp. 5-6].

The Church also teaches that material cooperation with evil is also morally wrong. "Material cooperation with evil is like in this particular case, for instance, we for instance as co-payers with the insurance would be cooperating in what we think is morally wrong. In other

4

words, it's cooperating in -- into something that we consider evil, or morally evil; and we are a part of that. We are a participant in that action or that program. And that's what we call material cooperation." [Bishop Guillory, Tr. p. 9]. Defendants do not challenge that Plaintiffs have a sincerely held religious belief that all forms of contraceptives and abortifacients are morally wrong.

B. Findings of Fact as to Catholic Diocese of Beaumont

The Catholic Diocese of Beaumont ("Diocese") is a non-profit organization that encompasses forty-four parishes and seven missions located in the greater Beaumont area. The Diocese employs over 950 people, approximately 370 of whom are currently eligible for health plan benefits offered through the Diocese. The Diocese carries out a tripartite mission of spiritual, educational, and social service. Its spiritual ministry is carried out through its parishes. Its educational ministry is conducted through its schools and religious education programs. The Diocese operates three parish schools and two diocesan schools which serve approximately 1,088 students.

Consistent with Church teachings on social justice, the Diocese provides a self-insured health plan to employees working at least thirty hours per week. The plan is offered through the Christian Brothers Employee Benefit Trust. Consistent with Catholic teaching, the Trust health plan does not cover abortifacients, sterilization, or contraception.[4] Dropping coverage for Catholic Charities so the Bishop would not have to sign the self-certification form would violate the sincerely held religious belief that employee health care is a right, and should be provided.

---

[4] Though generally not covered by the Trust plan, contraceptives may be covered when provided for medically necessary, non-contraceptive purposes that have been approved by the Trust.

C. Findings of Fact as to Catholic Charities of Southeast Texas, Inc.

Catholic Charities of Southeast Texas, Inc. ("Catholic Charities") is a faith-driven non-profit that provides services to approximately 6,000 individuals annually. Catholic Charities has ten full-time and seven part-time employees who are offered health insurance through the Diocese.

Catholic Charities participates in the Catholic charitable mission of aiding those in need, including feeding the poor, helping immigrants, and providing counseling. [Bishop Guillory, Tr. p. 11]. Bishop Guillory has the primary responsibility for determining whether programs administered by Catholic Charities comport with Catholic teachings and principles, and as such, it is an entity of the Catholic Diocese of Beaumont. [Bishop Guillory, Tr. pp. 11-12]. The Diocese contributes almost a third of the budget of Catholic Charities. The self-certification form at issue in this dispute would have to be signed either by Bishop Guillory or by another person with his approval. [Bishop Guillory, Tr. p. 22]. If the form were not prepared or coverage for Catholic Charities were dropped, the resulting fines would impose a heavy financial burden on Plaintiffs. [Bishop Guillory, Tr. p. 20]; [Sherlock, Tr. pp. 33-34].

D. The Statutory and Regulatory History

The now familiar statutory and regulatory history is outlined in the "Parties Stipulated Preliminary Findings" and is set out in detail in *E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, (S.D. Tex. Dec. 27, 2013), *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12-cv-2542, (E.D.N.Y. Dec. 16, 2013), and *Zubik v. Sebelius*, No. 13-cv-01459 (Pa. Nov. 21, 2013). In brief, Congress enacted the Patient Protection and Affordable Care Act (ACA) as well as the Health Care and Education Reconciliation Act in March 2010. This was followed by more than three years of rule making.

The ACA requires that group health insurance plans cover certain preventative medical services without cost-sharing, such as a copayment or a deductible. Pursuant to regulations subsequently issued, the preventative services that must be covered include contraception, sterilization, and related counseling (the "Mandate"). There was a good deal of concern over the impact of the law and regulations on the religious beliefs and practices of various faith groups and several proposals for some kind of religious exemption were published and amended. Some 600,000 comments were received during the process.

The Final Rules purport to accommodate religious objections to the Mandate in two ways. First, the Final Rules revised the definition of "religious employers," who are entirely exempt from the Mandate. The Final Rules define "religious employer" as a non-profit referred to in § 6033(a)(3)(A)(i) or (iii) of the Internal Revenue Code, which in turn refers to churches, their integrated auxiliaries, associations of churches, and the exclusively religious activities of religious orders. 78 Fed. Reg. at 39,874. The Diocese meets this definition and is thus exempt from the contraceptive mandate. Catholic Charities is not exempt. This is true even though Catholic Charities participates in the Diocese's health plan, because non-exempt entities cannot avail themselves of the religious employer exemption unless they "independently meet the definition of religious employer." *Id*. at 39,886.

The Final Rules provide for an "accommodation" for "eligible organizations" that do not meet the definition of "religious employer." An "eligible organization" is one that satisfies the following criteria:

(1) The organization opposes providing coverage for some or all of any contraceptive services required to be covered under § 147.130(a)(1)(iv) on account of religious objections.

(2) The organization is organized and operates as a nonprofit entity.

7

(3) The organization holds itself out as a religious organization.

(4) The organization self-certifies, in a form and manner specified by the Secretary, that it satisfies the criteria in paragraphs (b)(1) through (3) of this section, and makes such self-certification available for examination upon request by the first day of the first plan year to which the accommodation in paragraph (c) of this section applies. The self-certification must be executed by a person authorized to make the certification on behalf of the organization, and must be maintained in a manner consistent with the record retention requirements under section 107 of the Employee Retirement Income Security Act of 1974.

45 C.F.R. § 147.131(b).

There is no dispute that Catholic Charities would qualify for this accommodation if the self-certification form is signed. The Final Rules state that an eligible organization is not required to "contract, arrange, pay, or refer for contraceptive coverage" as to which it has religious objections. 78 Fed. Reg. at 39,874. Instead, the eligible organization must complete a self-certification form stating that it is an eligible organization, and provide a copy of that form to its issuer or, where an eligible organization self-insures, as do all plaintiffs here, to their TPA. The TPA is then required to provide or arrange for payments for contraceptive services, a requirement imposed through the Department of Labor's ERISA enforcement authority. *See id*. at 39,879-39,880. The self-certification "will be treated as a designation of the third party administrator(s) as plan administrator and claims administrator for contraceptive benefits pursuant to section 3(16) of ERISA." *Id.* at 39,879. The TPA is required to provide these services "without cost sharing premium, fee, or other charge to plan participants or beneficiaries, or to the eligible organization or its plan." *Id.* at 39,879-80. The TPA may seek reimbursement for such payments through adjustments to its Federally-Facilitated Exchange ("FFE") user fees. *Id.* at 39,882.

## II.     Legal Standard for Injunctions

"It is well-established that the party seeking a permanent injunction must demonstrate: '(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion.'" *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 626-27 (5th Cir. 2013) (quoting *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 126 S. Ct. 1837, 1839 (2006)).

## III.     Analysis

A. Article III Standing

Defendants have argued that Plaintiffs lack Article III standing, asserting that the government has no ability to enforce the contraceptive mandate because the health plan in question is a church plan not governed by ERISA. As discussed in detail by Judges Rosenthal and Cogan, the injury to the religious organizations relates to the submission of the self-certification form, not to whether a TPA may or may not be penalized for not providing contraceptive coverage. *E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, at *23 (S.D. Tex. Dec. 27, 2013). Indeed, the existence of a regulatory loophole cannot obviate Plaintiffs' standing. *Id.* "This alleged spiritual complicity is independent of whether the scheme actually succeeds at providing contraceptive coverage." *Roman Catholic Archdiocese of N.Y. v. Sebelius*, No. 1-12-cv-2542 (E.D.N.Y. Dec. 16, 2013).

Furthermore, the federal regulations governing Defendant Department of Labor, and those governing Defendant Department of the Treasury provide:

> (iii) The eligible organization must not directly or indirectly, seek to interfere with a third party administrator's arrangements to provide or arrange separate payments for contraceptive services for participants or beneficiaries, and must not, directly or indirectly, seek to influence the third party administrator's decision to make any such arrangement.

*Compare* 26 C.F.R. §54.9815-2713A(b)(iii), relating to Department of Treasury, Internal Revenue Service, and the exact same language in 29 C.F.R. §2590.715-2713A(b)(iii), relating to Department of Labor.

Mr. Sherlock, President of the Board of Plaintiff Catholic Charities, testified that he has already contacted insurers and plan providers to determine whether any would offer coverage if Plaintiffs did not provide a self-certification. [Mr. Sherlock, Tr. pp. 27-29]. What stronger way is there to influence a provider of goods and services than shopping your requirements to competitors? A rule that prevents plaintiffs from comparison shopping, and negotiating, for an acceptable policy on favorable terms is a burden.

Plaintiffs' injury is sufficient for the requirements of Article III standing.

B. First Amendment- Free Exercise of Religion

Prior to 1990, First Amendment jurisprudence relied on a compelling-interest test. *See Wisconsin v. Yoder*, 406 U.S. 205, 92 S. Ct. 1526 (1972); *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790 (1963). In 1990, the Supreme Court held that the "Free Exercise Clause of the First Amendment d[id] not prohibit governments from burdening religious practices through generally applicable laws." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 424, 126 S. Ct. 1211, 1216 (2006) (describing *Emp't Div., Dep't of Human Resources of Ore. v. Smith*, 494 U.S. 872, 110 S. Ct. 1595 (1990)). In *Smith*, the Supreme Court also held that "the

Constitution does not require judges to engage in a case-by-case assessment of the religious burdens imposed by facially constitutional laws." *Gonzales*, 546 U.S. at 424, 126 S. Ct. at 1216 (citing *Smith*, 494 U.S. at 883-90, 110 S. Ct. at 1602-06).

In response to *Smith*, Congress sought to restore the compelling-interest test by the passages of the Religious Freedom Restoration Act of 1993 ("RFRA") in 1993. 42 U.S.C. § 2000bb, *et seq.* "[T]he Federal Government may not, as a statutory matter, substantially burden a person's exercise of religion, 'even if the burden results from a rule of general applicability' unless the government can satisfy the compelling-interest test." *O Centro*, 546 U.S. at 424, 126 S. Ct. at 1216 (quoting § 2000bb-1(a)).

The threshold inquiry under RFRA is whether the Government's regulation substantially burdens the exercise of a sincerely held religious belief. *See Diaz v. Collins*, 114 F.3d 69, 71 (5th Cir. 1997). Defendants do not dispute Plaintiffs have a sincerely held religious belief that contraception and abortion is morally wrong; therefore, the only question that remains in this inquiry is whether the ACA substantially burdens that belief. If the court finds a substantial burden, the Government must then show that the burden "is in furtherance of a compelling governmental interest" and that it "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(b).

*1. Substantial Burden*

As ably discussed at length by Judge Rosenthal, Fifth Circuit case law uses a subjective standard for determining the presence of a substantial burden. So long as Plaintiffs are compelled or pressured by punitive fines to act or refrain from action, and that action or inaction is religiously offensive to them, a substantial burden exists. *See E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, at *26-40 (S.D. Tex. Dec. 27, 2013).

RFRA does not expressly define "substantial burden." *See Hicks v. Garner*, 69 F.3d 22, 26 n. 22 (5th Cir. 1995). The analysis of substantial burdens under RFRA is based on the pre-*Smith* cases *Yoder* and *Sherbert*.

In *Yoder*, the plaintiffs were Old Order Amish and Conservative Amish Mennonites who refused to enroll their fourteen- and fifteen-year-old children in public or private school, in violation of Wisconsin's compulsory education requirements, arguing that school attendance endangered the children's salvation. *Yoder*, 406 U.S. at 207-209, 92 S. Ct. at 1529-30. The Supreme Court in *Yoder* held that the

> impact of the compulsory-attendance law on respondents' practice of the Amish religion [wa]s not only severe, but inescapable, for the Wisconsin law affirmatively compels them, under threat of criminal sanction, to *perform acts* undeniably at odds with fundamental tenets of their religious beliefs. . . . [The compulsory-attendance law] carries with it precisely the kind of objective danger to the free exercise of religion that the First Amendment was designed to prevent. . . . [It] carries with it a very real threat of undermining the Amish community and religious practice as they exist today; they must either abandon belief and be assimilated into society at large, or be forced to migrate to some other and more tolerant region.

*Yoder*, 406 U.S. at 218, 92 S. Ct. at 1534-35.

In *Sherbert*, the plaintiff was a Seventh-Day Adventist who refused to work on her Sabbath, Saturday, and was denied unemployment benefits because of that. *Sherbert*, 374 U.S. at 399-401, 83 S. Ct. at 1791-92. The Supreme Court held that

> not only is it apparent that appellant's declared ineligibility for benefits derives solely from the practice of her religion, but the pressure upon her to forego that practice is unmistakable. The ruling forces her to choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion in order to accept work, on the other hand.

12

> Governmental imposition of such a choice puts the same kind of burden upon the free exercise of religion as would a fine imposed against appellant for her Saturday worship.

*Sherbert*, 374 U.S. at 404, 83 S. Ct. at 1794.

"Under RFRA, a 'substantial burden' is imposed only when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation v. U.S. Forest Serv.,* 535 F.3d 1058, 1069, 1069-70 (9th Cir. 2008) (en banc). The Fifth Circuit has explained government action substantially burdens a religious belief when it "truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs," in the RLUIPA context. *Moussazadeh v. Tex. Dept. of Criminal Justice*, 703 F.3d 781, 793 (quoting *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004)). Even indirect compulsion that infringes upon free exercise can be substantial. *See Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 718, 101 S. Ct. 1425, 1432 (1981).

Defendants have argued that any burden the ACA places on Plaintiffs is *de minimis*. Plaintiffs aver that it is not. District courts are split on this matter, with authority supporting both positions. *Compare University of Notre Dame v.Sebelius,* No. 13-cv-01276 (N.D. Ind. Dec. 20. 2013) (holding de minimus burden) *with E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009 (S.D. Tex. Dec. 27, 2013) (finding substantial burden exists).

So just what is being required of the Bishop in this case? According to the Government he need only sign EBSA Form 700, which contains a true statement of his, and the Church's, objection to contraceptive services. But, the regulations provide that "the self-certification **will be treated as a designation** of the third party administrator(s) as plan administrator and claims

13

administrator for contraceptive benefits . . . ." 78 FR 39879 (emphasis added). The rule drafters have chosen to be their own lexicographers, and the Government is bound by that choice. Like Humpty Dumpty, politicians may ascribe varied nuances of meaning and intent to their statements.[5] Judicial interpretation of federal regulations requires a more consistent, plain meaning approach. *See U.S. v. Woods*, ___ U.S. ___, 134 S. Ct. 557, 566-67 (2013).

The Government responds: "we have no power to actually compel the third party administrator provide the coverage so there is no burden." If the IRS and the Department of Labor are truly helpless hothouse flowers in this dispute, then why did the Government not accept this court's invitation to agree to a limited extension of Plaintiffs' deadlines to avoid the necessity of preparing for, and presenting, this case during a holiday season. *See* Doc # 5, p. 2, par. 3. Based on their docket sheets, there were, at the same time, cases around the country requiring the immediate attention of counsel for the Government, Mr. Humphries. *See also Archdiocese of New York*, p 11-12 (belated assertion of powerlessness argument), *East Tex. Baptist University*, p. 24, n.4 (why must form be signed now if it is meaningless?)

More importantly, given the history behind the adoption the First Amendment, can the court accept either the Government's *de minimus* argument or its assertion of powerlessness? Nobody would argue today that requiring any person of faith to sign a Test Act oath would be a *de minimus* burden on the exercise of religious beliefs.[6] Would the result be different if such an

---

[5] "When I use a word" said Humpty Dumpty, in rather a scornful tone "it means just what I choose it to mean-neither more nor less." Lewis Carroll, *Through the Looking-Glass*, 1872.

[6] *See* An Act for Preventing Dangers Which May Happen from Popish Recusants, 1672, 25 Car. II, c. 2, § 7 (Eng.) (commonly referred to as the Test Act of 1673) (averment of disbelief in transubstantiation); N.C. Const. of 1776, art. XXXII ("That no person, who shall deny the being of God or the truth of the Protestant religion, or the divine authority either of the Old or New Testaments, or who shall hold religious principles incompatible with the freedom and safety of

oath was worded to comport with the signer's personal belief, but another statute or regulation provided that it would be "treated as" the opposite? After all, once the oath is signed the Government would have no way of knowing what the person truly believed.

Submitting the self-certification affidavit is not simply espousing a belief that Plaintiffs hold. It is defined as an authorization for the TPA to provide coverage. It enables the exact harm that Plaintiffs seek to avoid, harm that Plaintiffs find religiously forbidden. If Plaintiffs choose to follow the course they believe their faith dictates, they face fines that all parties agree are onerous. The Diocese could dump Catholic Charities from its health plan, but this runs afoul of Church teachings on social justice and the rights of employees. This "Hobson's Choice" is a quintessential "substantial burden" on the free exercise of religious belief, prohibited by RFRA.

*2. Compelling Interest*

The RFRA states that "Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person . . . is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000bb–1(b). "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person' — the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 431-32.

Defendants propose two compelling interests: the promotion of public health and provision of equal access for women to healthcare. As stated by Judge Cogan, the Government's position that Christian Brothers could not be "required" or "mandated" to provide coverage for contraceptive services "fatally undermines any claim that imposing the Mandate on these

---

the State, shall be capable of holding any office or place of trust or profit in the civil department within this State.")

plaintiffs serves a compelling governmental interest. *Roman Catholic Archdiocese of New York v. Sebelius*, No. 12-cv-2542, at *33 (E.D.N.Y. Dec. 16, 2013).

On the other hand, if the objectives are simply assumed to be compelling, Defendants have failed to establish that this is the least restrictive means to achieve them. Indeed, several other district court opinions have provided a myriad of less restrictive alternatives. *See E. Tex. Baptist Univ. v. Sebelius*, No. 4-12-cv-3009, at *42-43 (S.D. Tex. Dec. 27, 2013) (discussing various less restrictive alternatives proposed by other courts). Defendants therefore fail to meet their burden.

C. The APA

Plaintiffs pled claims under the Administrative Procedures Act (APA). Plaintiff's proposed conclusions of law make no mention of the APA, and at the hearing, which Plaintiffs agreed could be consolidated with the trial, the issue was not raised. The Government's proposed conclusions of law included the somewhat circular analysis: "The regulations do not violate the Administrative Procedure Act because the regulations are in accordance with federal law." Nobody has asserted that the rulemaking process, or the procedures used for adopting the contested regulation violated the law, but the court has found that the regulations themselves violate Plaintiff's rights. That conclusion does not depend on an analysis of the APA. To make clear that the court is entering a final judgment, Plaintiff's APA claim is dismissed.

IV. Conclusion

Plaintiffs are entitled to a permanent injunction. To re- state the Order signed on December 31, 2013 [Doc. # 32], the Government is enjoined from applying or enforcing the regulations that require the Plaintiffs, their health plans, TPAs, or issuers, to provide or execute the self-certification forms that enable or require the TPA or issuer to provide health insurance

coverage for Plaintiff's employees for FDA-approved contraceptives, emergency contraceptives, products, or services under the requirements imposed in 42 U.S.C. § 300gg-13(a)(4), Pub. L. 11-148, § 1563(e)-(f), as well as the application of the penalties found in 26 U.S.C. §§ 4980D & 4980H, and 29 U.S.C. § 1132."

IT IS FURTHER ORDERED that all currently pending motions are DENIED as MOOT. A final judgment consistent with the Memorandum and Order shall be forthcoming.

So **ORDERED** and **SIGNED** this **2** day of **January, 2014.**

_____
Ron Clark, United States District Judge